# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| **BROWNING ENTERPRISE, INC.,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | **Case No.: 4:07-CV-1113-RDP** |
| } | |
| **REX IRON & MACHINE PRODUCTS** } | |
| **COMPANY, INC.,** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OPINION

**I.   INTRODUCTION**

Pending before the court is Defendant Rex Iron and Machine Products Company, Inc.'s ("Rex Iron" or "Defendant") Motion to Dismiss for Lack of Personal Jurisdiction, Or, in the Alternative, to Dismiss or Transfer for Improper Venue (Doc. # 3) filed on June 18, 2007. Plaintiff Browning Enterprise, Inc. ("Browning" or "Plaintiff") responded to the motion on June 25, 2007 and Defendant filed its reply on June 28, 2007. For the reasons stated below, the court finds Defendant's motion is due to be granted since the court concludes its lacks personal jurisdiction over Defendant.

**II.   STATEMENT OF FACTS**

Defendant Rex Iron is a Colorado corporation with its principal place of business in Colorado. (Doc. # 3 Ex. A at ¶ 3). It does not maintain an office in Alabama, have employees in Alabama, own property in Alabama, or have an agent in Alabama. (*Id.* at ¶ 4). Rex Iron is not licensed to do business in Alabama, nor does it regularly transact business in Alabama. (*Id.*). Rex Iron insists, and Defendant does not dispute, that its only known contact with Alabama is its purchase of certain custom steel parts from Browning, an Alabama corporation, in a series of either

three or four transactions. (*Id.* at ¶¶ 4, 8; Doc. # 6 at pp. 1–2). It is undisputed that Rex Iron representatives and employees were never physically present in Alabama during the negotiation of the purchase of these goods or anytime thereafter. (Doc. # 3 Ex. A at ¶ 4).

Plaintiff Browning is a corporation located and organized under the laws of Alabama, which manufactures various steel products at its Atalla, Alabama plant. (Doc. # 1; Doc. # 7 at p. 1). Plaintiff instituted this action by filing a complaint in the Circuit Court of Etowah County on May 11, 2007. (Doc. # 1). Rex Iron's agent was served with a copy of this complaint on May 18, 2007. (*Id.*). On June 13, 2007, Rex Iron timely filed a Notice of Removal of the action to this court, basing federal jurisdiction solely on diversity of citizenship. (*Id.*). In its Complaint, Plaintiff claims that Defendant has failed to pay for all of the goods that it shipped to Defendant, and has asserted claims of open account, account stated, breach of contract, and work and labor performed. (*Id.*). Defendant maintains that Plaintiff manufactured and shipped custom steel parts in excess of what it ordered. (*Id.*; Doc. # 3 Ex. A at ¶ 9). Defendant disputes that it is obligated to purchase these excess goods, and it is this dispute that forms the basis of the current lawsuit. (Doc. # 3 Ex. A at ¶ 9).

Rex Iron initially purchased steel taper brackets for use in a solar energy plant project (the goods that are the subject of the contract in question) from an Oklahoma company named Oilfield Pipe and Supply ("Oilfield"), through a Colorado company named Integrity Burning Services. (*Id.* at ¶ 5). As Browning admits, during negotiations to purchase additional goods directly from Oilfield, Oilfield elected to not move forward with the transaction, but referred the transaction to Browning. (*Id.* at ¶ 6; Doc. # 6 at p. 3). Browning initiated contact with Rex Iron through a telephone call from Dan Browning, Browning's President, to Aaron Haywood ("Haywood"), an employee of Rex Iron. (Doc. # 3 Ex. A at ¶ 7). As a result of Browning's solicitation, Rex Iron agreed to purchase, and

2

Browning agreed to manufacture, 700 custom steel parts in the first order on July 10, 2006, and an additional 10,000 parts in the second order on July 18, 2006. (*Id.* at ¶ 8; Doc. # 6 Exs. A, B & C). These parts were to be made to specifications outlined in a fax composed by Browning and sent to Rex Iron, and later referenced in the purchase transactions. (Doc. # 6 Ex. A). Browning asserts that Rex Iron further provided it with a "detailed drawing, designating how the pieces were to be fabricated," but Rex Iron insists that this drawing was solicited by Browning and that it did not direct how Browning was to complete its work. (Doc. # 6 at p. 1; Doc. # 7 at p. 7, Ex. A ¶ 6). There was no specification in either the faxed, undated letter (consummating the second order/contract) or the faxed "proposal" (consummating the first order/contract) as to where the goods were to be manufactured, but the final goods were manufactured in Alabama. (Doc. # 3 at ¶ 8; Doc. # 6, Browning Decl. at ¶ 4, Exs. A, B & C; Doc. # 7 Ex. A ¶ 6). Nevertheless, Rex Iron insists that there was no requirement that the goods be manufactured in Alabama using Alabama labor. (*Id.*). The parties agree that, although not specified on the proposal or letter cited above, the goods were to be shipped from Alabama to Colorado in bi-weekly shipments beginning mid-August 2006, and that the risk of loss did not pass from Browning to Rex Iron until the arrival of the goods. (Doc. # 3 at p. 7; Doc. # 6 Browning Decl. at ¶ 2; Doc. # 7 at p. 9). From July 10, 2006 to July 18, 2006, there were several telephone conversations about the above-referenced transactions between Haywood and Dan Browning, and these phone calls were initiated by both parties. (Doc. # 6 Browning Decl. ¶ 2).

On July 19, 2006, Haywood phoned Dan Browning, and advised him that Rex Iron needed 1,750 pieces as soon as possible,[1] since its solar energy plant project was "shut down" pending receipt of additional steel taper brackets. (Doc. # 6 at p. 2). Dan Browning advised Haywood that he could obtain steel plate from local sources and could begin fabrication immediately, but that the cost of the finished brackets would increase because of having to obtain the steel plate locally. (*Id.*). Haywood agreed to pay the increased amount, and Dan Browning prepared a proposal on a fax cover sheet and sent the proposal to Haywood. (*Id.*; Doc. # 6 Ex. D). Haywood approved the proposal by signing it and faxing it back to Dan Browning in Alabama. (Doc. # 6 at p. 2 & Ex. D). Over the course of the next several months, Browning manufactured the steel taper brackets in Alabama and made multiple shipments to Rex Iron, and Rex Iron made several payments to Browning by mailing checks to Alabama. (Doc. # 6 at p. 2 & Ex. E).

In September 2006, Plaintiff claims that Haywood called Dan Browning and ordered an additional 1,400 brackets. (Doc. # 6 Browning Decl. at ¶ 4; Doc. # 7 Ex. A ¶ 7). However, Defendant maintains that Dan Browning called Haywood to solicit an additional order and that Haywood told Dan Browning that he would have to check Rex Iron's current supply. (*Id.*). Defendant also claims that Haywood received a fax on September 19, 2006, again soliciting an additional order of brackets, but that he never agreed, orally or in writing, to purchase an additional

---

[1] Whether this "order" for 1,750 expedited pieces indeed constituted a separate order, over and above the 10,700 pieces already ordered by Defendant, or whether Defendant merely modified its previous contract with Plaintiff such that 1,750 pieces of the 10,700 already ordered would be expedited for an additional fee, is the crux of the dispute between the parties. The court need not address this issue in determining whether or not it has personal jurisdiction over Defendant, because, at most, taking Plaintiff's allegations as true, this simply adds one more "order" to the number of discrete orders placed by Defendant.

1,400 pieces from Browning.[2] (Doc. # 6 Ex. F; Doc. # 7 Ex. A at ¶ 8). Defendant supports its contention with the fact that the documentation submitted by Plaintiff—the sales order form—is unsigned by Haywood, or any other Rex Iron representative. (Doc. # 6 Ex. F). Plaintiff alleges that Haywood confirmed an order for the additional 1,400 pieces on September 22, 2006 by telephone with Dan Browning, and that on September 25, 2006, he called Browning and placed this fourth order on hold after Browning had already commenced production. (Doc. # 6 Browning Decl. at ¶ 4). In October or November 2006, Plaintiff states that Haywood advised Dan Browning that they no longer needed as many steel taper brackets as they originally thought and told Plaintiff to stop shipping more pieces. (*Id.*).

In total, Plaintiff alleges: (1) that it produced 12,333 pieces and had already shipped 11,725 pieces to Rex Iron in Colorado, before it was notified to cease further shipments; (2) that Rex Iron has only paid for 10,841 of the pieces shipped; (3) that it is undisputed that Rex Iron used 11,158 pieces during production; and (4) that Rex Iron has never returned any of the shipped, but unused pieces, to Browning. (Doc. # 6 at p. 2 & Browning Decl. at ¶ 5). In contrast, Defendant contends: (1) that it did not order an additional 1,750 brackets in July 2006, but only sought to modify the previous contract so as to expedite the shipment of these pieces; (2) that it did not place the final order for 1,400 brackets; and (3) that Plaintiff manufactured and shipped more brackets than Defendant ordered, and now expected Defendant to pay for these additional brackets. (Doc. # 3 Ex. A at ¶¶ 8–9; Doc. # 7 Ex. A at ¶¶ 7–9). However, it is not this underlying dispute that concerns the court today, but whether this court can constitutionally exercise jurisdiction over the Defendant.

---

[2]The balance of the dispute between the parties relates to this second transaction, with Defendant insisting it never ordered an additional 1,400 brackets and Plaintiff asserting that it did and that Plaintiff manufactured these brackets without compensation. (Doc. # 6 Browning Decl.).

## III.     DISCUSSION

Defendant has challenged the sufficiency of Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(2) (contesting the court's jurisdiction over the Defendant's person) and Rule 12(b)(3) (contending that venue is improper). FED. R. CIV. P. 12(b)(2) & (3). Because the court finds the inquiry into its personal jurisdiction over Defendant to be dispositive, it does not reach the issue of venue.

Plaintiff has the burden of establishing that personal jurisdiction over Defendant exists. *See LaSalle Bank N.A. v. Mobile Hotel Prop., LLC*, 274 F. Supp. 2d 1293, 1296 (S.D. Ala. 2003). Because Alabama's long-arm provision "authorizes the assertion of personal jurisdiction to the limits of the United States Constitution," Plaintiff may carry its burden "by demonstrating that personal jurisdiction over the Defendant meets the requirements of federal due process. Due process requires that the Defendant have 'certain minimum contacts' with the forum state and, second that the exercise of jurisdiction over the Defendant does not offend 'traditional notions of fair play and substantial justice.'" *LaSalle Bank*, 274 F. Supp. 2d at 1296 (internal citation omitted) (quoting *Burnham v. Superior Court of Cal., County of Marin*, 495 U.S. 604, 618 (1990) (in turn quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)); *see also Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).

A plaintiff can establish either general or specific jurisdiction over the Defendant to show personal jurisdiction exists. *See e.g., Int'l Shoe Co.*, 326 U.S. 310 (detailing contours of appropriate and inappropriate exercise of personal jurisdiction); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn.8–9 (1984) (acknowledging scholarly distinction made between exercise of "specific" and "general" jurisdiction). The parties in this case agree that the only issue

is whether this court has specific personal jurisdiction over Defendant. To constitute minimum contacts for the purposes of specific jurisdiction:

> [A] defendants' contacts with the applicable forum must satisfy three criteria: first, the contacts must be related to the plaintiff's cause of action or have given rise to it; second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws; and third, the contacts must be such that the defendant should reasonably anticipate being hauled into court in the forum.

*LaSalle Bank*, 274 F. Supp. 2d at 1297; *see also Sherritt*, 216 F.3d at 1291. The parties concede that any contacts Defendant may have with Alabama are related to Plaintiff's cause of action. However, in addressing the remaining two prongs, the court finds that Plaintiff cannot satisfy its burden as to either one, *i.e.*, it cannot show that Defendant purposefully availed itself of the privilege of conducting activities within Alabama, nor can it show that the Defendant's contacts with Alabama were such that it should have reasonably anticipated being hauled into court here. In the alternative, the court concludes that exercise of jurisdiction over the Defendant in this case would offend "traditional notions of fair play and substantial justice." *LaSalle Bank*, 274 F. Supp. 2d at 1296 (internal quotation and citation omitted).

At the outset, the court "notes that 'a court is required to make an independent factual assessment of a defendant's contacts with the forum when deciding whether it possesses jurisdiction over that defendant.'" *Lasalle*, 274 F. Supp. 2d at 1297 (quoting *Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino*, 960 F.2d 1217, 1224 (3rd Cir. 1992)). "'Each case must be judged on its particular facts.'" *Id.* (quoting *Mellon*, 960 F.2d at 1224, which in turn cites *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *see also Kulko v. Cal. Superior Court*, 436 U.S. 84, 92 (1978) ("[T]he *International Shoe* 'minimum contacts' test is not susceptible to mechanical application; rather, the

facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present." (citations omitted)).

  **A.**  **Defendant Does Not Have the "Certain Minimum Contacts" with Alabama that are Required to Satisfy Due Process.**

    **1.**  <u>**Defendant did not purposefully avail itself of the privilege of conducting activities within Alabama.**</u>

The first question here is whether Defendant purposefully availed itself of the privilege of conducting activities within Alabama. Both parties cite to *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1057–61 (11th Cir. 1986). Defendant argues that *Borg-Warner* is controlling, while Plaintiff attempts to distinguish it. In *Borg-Warner*, the Eleventh Circuit held that a judgment obtained in Missouri was unenforceable because the Missouri court that entered it lacked personal jurisdiction over the defendant, a Georgia resident and one-time purchaser of goods from a Missouri manufacturer. *Id.* at 1056. The contract at issue was negotiated and entered in Georgia. No representative of the defendant visited Missouri to negotiate the contract or to inspect the Missouri manufacturing facilities prior to delivery of the goods. *Id.* The bank that financed the purchase obtained a default judgment against the Georgia purchaser in a Missouri court. *Id.* The bank then filed suit in Georgia to collect on the Missouri judgment. The Southern District of Georgia dismissed the action on the grounds that the Missouri court lacked personal jurisdiction over the defendant and its judgment was, therefore, null and void.

On appeal, the Eleventh Circuit affirmed, noting that "the purchaser in an isolated transaction may not be subject to personal jurisdiction in a seller's state merely because the manufacturer performed its duties under the contract there." *Id.* at 1063. Although the defendant in *Borg-Warner* visited Missouri to return some of the goods, the court held that this single post-transaction visit was

insufficient to permit the Missouri court to exercise personal jurisdiction. In so holding, the court recognized the rule that a mere "one-time purchaser of goods from a seller in the forum cannot be constitutionally subject to the exercise of personal jurisdiction by the courts of the forum state." *Id.* at 1059 (citing *Owen of Ga., Inc. v. Blitman*, 462 F.2d 603 (5th Cir. 1972)).[3]

The continuing validity of *Borg-Warner* was recently confirmed by the Eleventh Circuit in *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 933 (11th Cir. 2007). In *Sloss*, the plaintiff obtained a default judgment against the non-resident defendant on claims relating to goods sold by the plaintiff, an Alabama company, to the defendant. On appeal, the non-resident defendant, citing *Borg-Warner*, asked the Eleventh Circuit to set aside the judgment for lack of personal jurisdiction. While the Eleventh Circuit recognized the rule that a limited purchaser is not subject to personal jurisdiction, it distinguished the facts of *Borg-Warner* and held that the court could constitutionally exercise personal jurisdiction over the non-resident defendant. *Id.* The factors on which the Eleventh Circuit relied to distinguish *Borg-Warner* are particularly instructive here. Unlike the limited transactions

---

[3]Other jurisdictions agree that a limited purchaser of goods cannot be constitutionally subject to personal jurisdiction in the forum of the manufacturer/seller. *See, e.g.*, *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1983) (holding that out-of-state purchaser's travel to the forum state to discuss problems with the goods purchased did not amount to purposeful availment of the laws of the forum); *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 313–14 (8th Cir. 1982) (holding that "merely entering into a contract with a forum resident does not provide the requisite contacts between a nonresident defendant and the forum state" and pointing out that the "use of interstate facilities (telephone, the mail), the making of payments in the forum state, and the provision for delivery within the forum state are secondary or ancillary factors and cannot alone provide the minimum contacts required by due process."); *Lakeside Bride & Steel Co. v. Mountain State Constr. Co.*, 597 F.2d 596, 601 (7th Cir. 1979) (holding that performance of contractual obligations by the resident seller cannot serve as sufficient contact to confer jurisdiction over the out-of-state purchaser, "at least when the contract does not require the plaintiff to perform in the forum state."); *Whitaker Corp. v. United Aircraft Corp.*, 482 F.2d 1079, 1085 (1st Cir. 1973) (holding personal jurisdiction did not exist over a passive one time purchaser whose only contact with the forum was a visit to the manufacturer after the initial shipment of goods).

involved in *Borg-Warner*, *Sloss* involved ten purchases over a period of several months, "thereby establishing a course of dealing." *Id.* During that period, the non-resident purchaser visited the forum to discuss the manufacturer's process, ways to improve that process, and to propose an exclusive arrangement to distribute the manufacturer's product in the European market. *Id.* In addition, the non-resident purchaser shipped samples of the product to the forum for the manufacturer to inspect. *Id.* Finally, for six of the ten orders placed, the non-resident purchaser had its agent ship containers into the forum for use in shipping the goods. *Id.* In light of the defendant's extensive contacts with the forum, the Eleventh Circuit held that the non-resident defendant had purposefully availed itself of the laws of Alabama and could be constitutionally subject to personal jurisdiction there. *Id.*

This court finds *Borg-Warner* controlling in the present case. Although there is some dispute in the pleadings as to the quantity of orders that Defendant placed with Plaintiff, the documentation provided by Plaintiff shows that there were at least two, and at most three, separate orders, placed within a span of ten days.[4] Thus, this case is more factually similar to the cases in which courts have

---

[4]The first orders were all placed from July 10, 2007 to July 19, 2007. It is undisputed that Defendant ordered 700 custom steel parts in the first order on July 10, 2006, and an additional 10,000 parts in the second order on July 18, 2006. The last "order" which occurred during this time period and related to 1,750 expedited parts is the crux of the dispute between the parties. Plaintiff claims it was a separate, additional order, while Defendant insists it was merely a modification to the shipping itinerary of the previously placed orders. For the purposes of this motion only (and despite the substantially conflicting accounts and ambiguous supporting documentation), the court will assume that Defendant placed at least three orders with Plaintiff during these ten days.

However, the alleged September order is another matter. In September 2006, Plaintiff claims that Haywood called Dan Browning and ordered an additional 1,400 brackets. Defendant maintains that Dan Browning called Haywood to solicit an additional order and that Haywood told Dan Browning that he would have to check Rex Iron's current supply. Defendant claims that Haywood received a fax on September 19, 2006, again soliciting an additional order of brackets, but that he never agreed, orally or in writing, to a purchase of an additional 1,400 pieces from Browning.

refused to exercise jurisdiction over a defendant where the defendant placed a limited number of orders with the resident plaintiff. *Compare Borg-Warner Acceptance Corp.*, 786 F.2d at 1059 (refusing personal jurisdiction in case involving one purchase) *with Sw. Offset v. Hudco Publ'g Co.*, 622 F.2d 149 (5th Cir. 1980) (personal jurisdiction upheld in case involving nine purchases)[5] *and Sloss Indus. Corp.*, 488 F.3d at 933 (personal jurisdiction upheld in case involving ten purchases). Furthermore, it is well established that "'[s]olicitation by a nonresident purchaser for delivery outside the forum state is a more minimal contact than that of a [nonresident] seller soliciting the right to ship goods into the forum state.'" *Borg-Warner*, 786 F.2d at 1059 (quoting *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 314 (8th Cir. 1982)). Thus, Defendant's limited purchases in Alabama are less jurisdictionally significant than the case of a seller seeking to sell and ship goods into a forum state, and this is even more the case because such purchases were admittedly solicited by Plaintiff.

---

Defendant supports its contention with the fact that the documentation submitted by Plaintiff—the sales order form—is unsigned by Haywood, or any other Rex Iron representative. (Doc. # 6 Ex. F). Plaintiff alleges that Haywood confirmed an order for the additional 1,400 pieces on September 22, 2006 by telephone with Dan Browning, and that on September 25, 2006, he called Browning and placed this fourth order on hold after Browning had already commenced production. In October or November 2006, Plaintiff asserts that Haywood advised Dan Browning that they no longer needed as many steel taper brackets as they originally thought and told Plaintiff to stop shipping more pieces. According to the documentation submitted by Plaintiff, and for the purposes of this motion only, the court notes that Defendant's version of the alleged September order is more plausible, especially considering the prior dealings between the parties (which always culminated in a document signed by Defendant's representative). However, and in any event, the court notes that an increase in the number of total orders from three to four is immaterial to its decision herein.

[5]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

In addition to making at most a few limited purchases of steel parts, Defendant has almost no contacts with Alabama. It is undisputed that no representative of Defendant ever visited Alabama, Defendant never shipped anything to Alabama (save payments to Plaintiff, discussed *infra*), and Defendant does not regularly transact business in Alabama, maintain offices in Alabama, or employ agents in Alabama. Plaintiff admits to soliciting Defendant's business, and, therefore, to initiating the series of transactions at issue in the case. Plaintiff is the party that shipped the steel parts to Defendant in Colorado, who apparently took possession of the goods "F.O.B. Colorado" such that the risk of loss did not pass from Plaintiff to Defendant until the arrival of the goods in Colorado (even though this was not specified in the communications between the parties). There was no provision in any of the communications between the parties where the steel parts were to be manufactured. The court finds that Defendant's provision of specifications regarding the parts outlined in a fax and later referenced in the purchase transactions—regardless of whether Plaintiff solicited such information—provides at best, little weight in favor of finding jurisdiction.

Another factor that Plaintiff points to is that Defendant mailed payments for the custom steel parts to Alabama. However, the sending of payments to the forum is not a jurisdictionally significant contact. Otherwise, all out-of-state purchasers would be subject to personal jurisdiction in the forum state of the seller. Rather, the sending of payments to the forum state is merely a "secondary or ancillary" factor, *Borg-Warner*, 786 F.2d at 1059 (quoting *Scullin Steel Co.*, 676 F.2d at 314), that "does not weigh heavily in the calculus of contacts." *Gen. Elec. Credit Corp. v. Scott's Furniture Warehouse Showroom, Inc.*, 699 F. Supp. 907, 913 (N.D. Ga. 1988). *See also Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1983) ("Nor do we weigh heavily the fact that [the purchaser] may have mailed payment checks into the forum state in exchange for the goods.").

Plaintiff also argues that Defendant had "knowledge that the fabrication would take several months, with multiple shipments, and involve the production skills of many Alabama employees." However, again, there was no contractual provision detailing how long production would take, nor requiring that the goods be made in Alabama. Also, as previously stated, the steel parts were shipped "F.O.B. Colorado" *by Plaintiff*. In fact, each of these "contacts" actually references an activity undertaken *by Plaintiff*—*i.e.*, the initial solicitation of Defendant, production of the goods, employment of Alabama residents, the duration of production, and the shipping of the goods. In *Hanson v. Denckla*, the Supreme Court stated, "the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." 357 U.S. 235, 253 (1958). Moreover, many courts have specifically found that the mere production of goods by the seller in the forum state coupled with the seller's shipment of goods to the Defendant's state does not establish the contacts requisite to exercise personal jurisdiction.[6] *Borg-Warner*, 786 F.2d at 1059–63; *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1983), *cert. denied*, 466 U.S. 962 (1984); *Scullin Steel Co. v. Nat'l R.y Utilization Corp.*, 676 F.2d 309, 313–14 (8th Cir. 1982); *Lakeside Bridge & Steel Co. v. Mountain State Constr. Co.*, 597 F.2d 596, 600–604 (7th Cir. 1979), *cert. denied*, 445 U.S. 907 (1980); *Whittaker Corp. v. United Aircraft Corp.*, 482 F.2d 1079, 1084–85 (1st Cir. 1973).

Thus, after considering each of Defendant's contacts with Alabama—sending payments to Alabama, engaging in telephone conversations with Plaintiff that were initiated by both parties,

---

[6]Similarly, several courts have held mere communications regarding purchases to be jurisdictionally insignificant contacts. *See, e.g.*, *Hydrokinetics*, 700 F.2d at 1029 (terming the exchange of communications between Texas and Alaska as "insufficient to be characterized as purposeful activity invoking the benefits and protections of the forum state's laws") (internal citations omitted).

placing a limited number of orders to purchase steel parts, and providing specifications for these parts that may or may not have been solicited by Plaintiff—the court concludes that Plaintiff cannot show that Defendant purposefully availed itself of the privilege of conducting activities within Alabama.

In addition to its assertion that this case is factually similar to *Sloss* (an assertion the court has rejected above), Plaintiff also argues that *Sw. Offset, Inc. v. Hudco Publ'g Co.*, 622 F.2d 149 (5th Cir. 1980) is on point. For the reasons stated below, the court also finds this case is distinguishable from *Hudco Publ'g*. In *Hudco Publ'g*, a Texas district court found that it had specific jurisdiction over an Alabama publisher, Hudco, who employed a Texas printing firm, Southwest. A review of that decision shows it did so for four reasons. First, even though Southwest solicited the initial order from Hudco, Hudco placed another eight orders in writing or over the phone without being solicited. Second, Hudco mailed to the printer in Texas several shipments of camera-ready copies of its telephone directories, and, after it received proofs of the directories from the printer, returned corrected proofs to the printer in Texas. Third, all of the directories were printed in Texas, and the publisher mailed some payments to Texas. Fourth, Texas law governed the parties' contracts, as all but the first contract were consummated by Southwest accepting Hudco's offers.

With the exception of the third reason cited by that court, this case is clearly distinguishable from *Hudco Publ'g*. Here, there were no sample shipments to Plaintiff, Defendant placed (at most) four orders, and the contracts will most likely be governed by Colorado law, which is the state where Defendant accepted Plaintiff's offers, as discussed *infra*. Moreover, in *Hudco Publ'g*, Southwest shipped the directories "F.O.B. Dallas," the in-state seller's place of business, whereas here the goods were shipped to Colorado, the out-of-state buyer's place of business. *See Commc'n*

14

*Equip. & Contracting Co., Inc. v. Municipality of Anchorage, Alaska*, 498 F. Supp. 632, 635 (M.D. Ala. 1980) (finding the shipping destination of goods and where the risk of loss passed to the out-of-state buyer to be jurisdictionally significant). Thus, for purposes of *in personam* jurisdiction, the court finds that this case is more factually similar to *Borg-Warner* than *Hudco Publ'g* or *Sloss*. Plaintiff has simply failed to carry its burden of establishing that Defendant purposefully availed itself of the privilege of conducting activities within Alabama.

>   **2.   Defendant should not have reasonably anticipated being hauled into court in Alabama.**

In addition to finding that Defendant did not purposely avail itself of conducting activities in Alabama, the court also concludes that Defendant should not have reasonably "anticipate[d] being hauled into court" in Alabama. *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). In addition to those factors previously discussed above, which indicate that Defendant would not have reasonably anticipated having to defend in Alabama, the court finds that the contracts at issue in this case would most likely not be governed by Alabama law.[7] No party asserts, and a review of the communications between the parties does not reveal, that the contracts themselves state what law controls. Plaintiff asserts, without support, that Defendant purposefully availed itself of the privileges of conducting business in Alabama, and therefore should have anticipated having to defend in Alabama, because it "enter[ed] into contracts governed by the State of Alabama."

---

[7]The court *does not* determine which law—Colorado or Alabama—governs the contracts in this case, but merely analyzes the question in light of the jurisdictional issue. Thus, although it does not definitively resolve the choice of law issue, the court finds that a court determining which law were to govern these contracts would more likely find that Colorado, rather than Alabama, law controls.

However, the court finds that this is not necessarily the case. Alabama choice of law rules follow the traditional principle *lex loci contractus*, which provides that a contract is "governed by the laws of the state where it is made." *Lemuel v. Admiral Ins. Co.*, 414 F. Supp. 2d 1037, 1049 (M.D. Ala. 2006); *see also Stovall v. Universal Constr. Co., Inc.*, 893 So.2d 1090, 1002 (Ala. 2004) (noting that in absence of agreement to the contrary, Alabama courts apply the law of the state where the contract was formed); *Ideal Structures Corp. v. Levine Huntsville Dev. Corp.*, 396 F.2d 917, 923–25 (5th Cir. 1968) (rejecting lower court's conclusion that Alabama's adoption of the UCC signaled a deviation from the traditional choice of law principle *lex loci contractus*). A contract is thus "made" in the state in which the last act essential to execution of the contract took place. *Ideal Structures Corp.*, 396 F.2d at 923–25 (citing *Ailey v. Nationwide Mut. Ins. Co.*, 570 So.2d 598, 599 (Ala. 1990) and *Ferris v. Jennings*, 851 F. Supp. 418, 421 (M.D. Ala. 1993)).

In resolving choice of law issues, Colorado follows the "most significant relationship" approach of the *Restatement (Second) of Conflict of Laws* (1971) for both tort and contract actions. *E.g., ITT Specialty Risk Servs. v. Avis Rent A Car Sys., Inc.*, 985 P.2d 43, 47 (Colo. Ct. App. 1998). Thus, a Colorado court would apply a multi-factor test to determine whether the contracts at issue in this case are governed by Alabama or Colorado law.[8] This court will not speculate as to which

---

[8]The relevant portion of § 6 of the *Restatement (Second) of Conflicts of Laws*, states the factors to be taken into account:

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

    (a) the needs of the interstate and international systems,

    (b) the relevant policies of the forum,

    (c) the relevant policies of other interested states and the relative

<u>law it would choose, but merely</u> points out that several of the factors to be considered weigh heavily

> interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

RESTATEMENT SECOND OF CONFLICT OF LAWS § 6 (1971). Section 188 of the *Restatement (Second) of Conflict of Laws*, entitled "Law Governing In Absence Of Effective Choice By The Parties," lists the contacts to be taken into account in applying the principles of § 6 , which are:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
>> (a) the place of contracting,
>>
>> (b) the place of negotiation of the contract,
>>
>> (c) the place of performance,
>>
>> (d) the location of the subject matter of the contract, and
>>
>> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.
>>
>> These contacts are to be evaluated according to their relative importance with respect to the particular issue.
>
> (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

RESTATEMENT SECOND OF CONFLICT OF LAWS § 188 (1971).

in favor of applying Colorado law.

Under Alabama law, the last act essential to execution of the agreements at issue in this case occurred in Colorado. In each instance, except for possibly the undated letter in which Defendant ordered 700 steel parts, Plaintiff faxed "proposals" to Defendant in Colorado. (Doc. # 6 at Browning Decl. at ¶ 3 & Exs. A, B, C, D & F). As Plaintiff admits, Defendant "approved of the proposal by signing it and faxing it" back to Plaintiff. (Doc. # 6 at pp. 1–2). Under the rules of contract formation in both Alabama and Colorado, the execution of the parties' agreement occurred at the moment Defendant sent the fax indicating acceptance of Plaintiff's "proposals." *See Hatchett v. Molton*, 76 Ala. 410, at *2 (1884) ("A written contract, deposited in the mail, addressed to the promisee, and afterwards received by him, becomes a binding contract from the day of its deposit in the mail") *and Pietramale v. Robert G. Fisher Co., Inc.*, 638 P.2d 847, 848 (Colo. Ct. App. 1981) (contract formed upon acceptance of a proposal); *see also Cardon v. Hampton*, 109 So. 176, 177 (Ala. App. 1926) (recognizing the rule that a contract made over the telephone is regarded as having been made at the place where the accepting party speaks) *and Rice v. Gifford*, 110 P.2d 1113, 1114 (Colo. 1941) (addressee's acceptance of terms set out in letter created contract between addressee and sender). Moreover, the Uniform Commercial Code, which has been enacted in both Colorado and Alabama, adopts the common law "dispatch rule" for modern means of electronic communication, such as facsimile. *See* UCC § 1-201 (36) & 1-202(d), as adopted in ALA. CODE § 7-1-101 *et seq.* (2005) and COLO. REV. STAT. § 4-1-101 *et seq.* (2006). Thus, the agreements at issue were accepted and made in Colorado, and would more likely be governed by the laws of that state.

Further, even if Alabama law applied to the underlying transactions at issue in this case, that alone would not be determinative of jurisdiction. Case law indicates that choice of law is only a

significant factor for jurisdictional purposes in cases where the parties have expressly selected the law of the forum. *See, e.g.*, *Gold Kist, Inc. v. Baskin-Robbins Ice Cream*, 623 F.2d 375, 381 n.4 (5th Cir. 1980) (holding that parties' choice of forum law to govern parties relationship showed purposeful availment); *see also Hydrokinetics, Inc.*, 700 F.2d at 1031 (noting that parties' choice of Alaska law diminished the significance of the place of contracting). This is not the situation here, where the parties' communications are silent on the choice of law issue. Therefore, the court finds, for the purposes of *in personam* jurisdiction only, that the contracts at issue in this case would more likely than not be governed by Colorado law. Moreover, the court determines that the choice of law issue here does not control the jurisdictional issue as the parties failed to select the law governing their dealings. Having made this finding, and for the reasons stated above, the court also concludes that Plaintiff has failed to carry its burden of proving both that Defendant purposefully availed itself of the privilege of conducting activities within Alabama, and that Defendant should not have reasonably anticipated being hauled into court in Alabama, such that Plaintiff has not established Defendant had the certain minimum contacts with Alabama requisite to satisfy due process concerns.

> **B.    In Any Event, this Court's Exercise of Jurisdiction over Defendant in This Case Would Offend "Traditional Notions of Fair Play and Substantial Justice."**

Alternatively, even if Plaintiff had established that Defendant had such "certain minimum contacts" with Alabama (which it has not), Plaintiff cannot show that the exercise of this court's jurisdiction over Defendant in this case does not offend "traditional notions of fair play and substantial justice." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 259 (11th Cir. 1996). The relevant factors, as adapted to the dispute in this case, are the burden on Defendant of litigating in Alabama, Alabama's interest in adjudicating the dispute, and Plaintiff's interest in obtaining

19

convenient and effective relief.  *See Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 933 (11th Cir. 2007) (citing *Asahi Metal Indus. Co. Ltd. v. Superior Court*, 480 U.S. 102, 113–15 (1987); *McGow v. McCurry*, 412 F.3d 1207, 1215–16 (11th Cir. 2005)).  "This is essentially a reasonableness inquiry." *Sloss*, 488 F.3d at 933.  The court concludes that hauling a very limited purchaser of Alabama goods—who was solicited by an Alabama company, did not visit Alabama, nor have any other significant contact with the state (save making payments and communicating with the Alabama company about the purchases solicited by the seller)—into an Alabama court would offend traditional notions of fair play and substantial justice.  Therefore, Plaintiff cannot carry its burden on the fairness inquiry for purposes of due process.

**V.    CONCLUSION**

For the reasons set forth above, Defendant Rex Iron and Machine Products Company, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction, Or, in the Alternative, to Dismiss or Transfer for Improper Venue (Doc. # 3) is due to be granted, as the court concludes it lacks personal jurisdiction over Defendant.  This case will be dismissed without prejudice.  The court will enter a separate order in accordance with this memorandum opinion.

**DONE** and **ORDERED** this ___13th___ day of August, 2007.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE